## IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

BRYAN LEVY, INDIVIDUALLY, AND AS
PARENT AND NEXT FRIEND OF BOWEN
LEVY, DECEASED AND AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF
BOWEN LEVY
730 Springdale Avenue
Annapolis, MD 21403

and

TANYA LEVY, INDIVIDUALLY, AND AS
PARENT AND NEXT FRIEND OF BOWEN
LEVY, DECEASED
730 Springdale Avenue
Annapolis, MD 21403

                Plaintiffs,

vs.

ANNE ARUNDEL COUNTY BOARD OF
EDUCATION
2644 Riva Road
Annapolis, MD 21401

<u>Serve on</u>:
President Melissa Ellis
2644 Riva Road
Annapolis, MD 21401

and

NATALIE MARSTON
Principal
Central Special School
140 Stepney Lane
Edgewater, Maryland 21037

              Defendants.

Case No.: _____

C-02-CV-21-000119

1

## COMPLAINT AND JURY TRIAL DEMAND

The Plaintiffs, Bryan and Tanya Levy, individually and as parents and next friend of Bowen Levy, deceased, and Bryan Levy as Personal Representative to the Estate of Bowen Levy, deceased, by and through their attorneys, Timothy F. Maloney, Matthew M. Bryant, Alyse L. Prawde, and Joseph Greenwald & Laake, P.A., and David M. Simpson and David M. Simpson, P.A. sues the Defendants Anne Arundel County Board of Education and Principal Natalie Marston for cause, and claims damages, demands judgment, and states for cause the following:

Bowen (Bo) Levy was a much loved 17 year old child with special needs, including autism.  He died over one year ago, on November 10, 2019, after swallowing and choking on a rubber glove five days earlier at Central Special, an Anne Arundel County public school for special needs children.  The school system knew that in addition to autism, Bowen suffered from pica, a compulsive condition which caused him to swallow and eat non-food items.  Bowen's pica was well known to the Anne Arundel County school system, which promised to provide him 1:1 supervision, a promise his parents relied upon.  Anne Arundel County Public Schools broke that promise.

On November 5, 2019, Bowen's teacher left at 12:45 p.m.  Student volunteers were present in the classroom instead of trained caregivers.  Multiple staff member substituted, but not all reviewed the sub plans.  Near the end of the school day, Bowen was able to obtain a swallow a rubber glove due to lack of supervision in the classroom. He lost oxygen for approximately ten minutes, became unconscious, and died five days later.

Bowen's parents have repeatedly demanded answers from the school system about how this could have happened. The school system has promised "an investigation."   No investigators

have ever contacted Bowen's parents. No one will tell Bowen's family the status of this "investigation" or even who is performing it.  On August 24, 2020, Bowen's dad, Bryan Levy, wrote school superintendent George Arlotto demanding answers and asking about the investigation. Dr. Arlotto and the Board of Education have never provided meaningful answers concerning how Bowen's death could have occurred under the school system's watch.  He has not provided any answers to Bowen's family or others who have demanded accountability.

Bowen's parents obtained the results of the Department of Social Services investigation. DSS concluded that the Department of Social Services investigation found Bowen died as a result of the "system failures" at Central Special School. DSS found "there is evidence of child maltreatment" and "child neglect" by the caregivers at the school. DSS made a formal finding of "neglect" on the part of the school system workers. DSS concluded that "**It is the assessment of the investigator/worker that Bowen Levy died as a result of the systemic failure at Central Special School.**"

Bowen's parents now bring this action on behalf of Bowen and themselves to obtain answers from the Board of Education and to obtain some measure of accountability for the death of their son.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter and all parties pursuant Md. Code, §§ 6-102 and 103 of the Courts & Judicial Proceedings Article ("C.J.P.").

2.      Venue is properly before this Court pursuant to C.J.P. §§ 6-201 and -202 because the Board of Education for Anne Arundel County is situated in Anne Arundel County and all material events occurred in Anne Arundel County, Maryland.

## PARTIES

3.      Plaintiff Bryan Levy is an adult citizen of the State of Maryland, residing at 792 Parkwood Avenue, Annapolis, MD 21403. Mr. Levy is the surviving father of the Decedent, Bowen Joseph Levy, deceased. He brings this action both individually and as the Personal Representative of the Estate of Bowen Levy pursuant to Letters of Administration issued by the Register of Wills for Anne Arundel County. *See Estate of Bowen Joseph Levy*, Estate No.: 99488 (Orphan's Court for Anne Arundel County).

4.      Plaintiff Tanya Levy is an adult citizen of the State of Maryland, residing at 792 Parkwood Avenue, Annapolis, MD 21403. Ms. Levy is the surviving mother of the Decedent, Bowen Levy, deceased.

5.      Bowen is survived by two sisters, Addison Levy and Destyn Hughes, who loved and care for him.

6.      Defendant Anne Arundel County Board of Education (the "Board" and/or the "Board of Education") constitutes the governing body for the Anne Arundel County Public School ("AACPS"). The Board's principal office is located at 2644 Riva Road, Annapolis, MD 21401. The Board is a corporate body created under Md. Code, § 3-103 of the Education Article.

7.      At all times mentioned, Defendant Natalie Marston was principal Central Special and responsible for the administration of the school, the safety of the students, the staffing of the classrooms, and the security of the classrooms.

## FACTS COMMON TO ALL COUNTS

8.      Bowen Levy, the Decedent, was born on November 18, 2001.   He was known as "Bo."   He was 17 when he died, eight days away from his 18th birthday.



9.      When Bowen was a young child, he was diagnosed with certain disabilities, including autism and pica. Pica is a disorder that manifests itself by the eating of substances or objects that have no nutritional value. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, at 330 (2013) (Pica is characterized as "the eating of one more nonnutritive, nonfood substances on a persistent basis over a period of at least 1 month.").

10.     In 2007, Plaintiffs Bryan and Tanya Levy started the Bowen Foundation for Autism to help families with autistic children who are unable to afford the services that improve the lives of these children. This organization continues to operate to today.

11.     Central Special is a public school in Edgewater, Maryland operated by Anne Arundel Public Schools. Central Special educates children from preschool age through 21 years old.  Central Special offers a full day educational program from children with several disabilities.

12.     Bowen attended Central Special from approximately 2005 until his tragic death on November 10, 2019.

13.     In 2015, Bowen's parents were concerned about Bowen's development and educational progress at Central Special. Bowen's parents began a concerted effort to address what they perceived as deficiencies in the educational program offered to Bowen. Due to this frustration, Bryan and Tanya Levy sought to have Bowen placed in a private school to address these deficiencies.

14.     On November 19, 2015, Anne Arundel County Public Schools wrote that "AACPS does not agree to fund a nonpublic placement for Bowen," but it was "offering to convene an Individualized Education Program (IEP) team meeting to discuss his educational program, clarify your client[']s concerns, and review and revise his IEP to address those concerns, as appropriate."

15.     On December 22, 2015, counsel for Bowen's parents were concerned about Bowen's education and development progress at Central Special and requested, among other things, an alternative school placement. The letter stated: "The parents voiced concerns about lack of progress and requested consideration of an alternative school placement."

16.     In a letter dated August 8, 2016, Alison B. Barmat, Program Manager, Compliance and Legal Issues for Anne Arundel County Public Schools, rejected Bowen's parents request to have Bowen moved to a different school:

> It is not clear what additional services would be provided to Bowen in a nonpublic setting, or why the parents expect more growth. Bowen is currently in a separate

6

special education day school, receiving integrated related services. He is making progress in that setting, and there is no basis to support the parent's statement that his progress would be greater in a nonpublic setting which offers analogous services.

17.     In order to address Bryan and Tanya Levy's concerns, on August 30, 2016, the Anne Arundel County Public Schools, through Principal Natalie Marston and others, as part of a medication agreed to provide one on one support for Bowen and memorialized this agreement that "you and AACPS signed a Special Education Mediation Agreement that included the following terms:"

> 1. **AACPS will assign a 1:1 for Bowen for instructional purposes focusing on function skills (including, but not limited to self-help and communication skills).**
> 2. **The AACPS program specialist certified as a BCBA will provide consultation/observation/modeling for the 1:1.**
> 3. Speech/language services will be increased to 3-30 minute sessions weekly.
> 4. Occupational therapy will be increased to 30 minutes/weekly.
> 5. AACPS will provide the recommended communication device for use in the home.
> 6. AACPS will consult with the familys' in home provider to ensure consistency in programming.
> 7. AACPS will convene a 60 day review to review progress.
> 8. AACPS will compensate the costs of the private evaluator attending the IEP team meeting on receipt of invoices ($937.50)
> 9. AACPS will pay the parent's attorney a sum of $1,000.00 on receipt of invoices.
> 10. This agreement resolves all concerns through this date of this agreement.
> 11. The parents will and hereby do agree to withdraw their request for a due process hearing with prejudice.

(Emphasis added).

18.     On August 30, 2016, Allison Barmat, Program Manager for Compliance and Legal Issues, sent a memorandum to Principal Natalie Marston allocating responsibilities for implementing the result of the mediation. These tasks included assigning a 1:1 paraeducator to Bowen, which was assigned the Principal Marston, and it was to be completed "ASAP." It

described the task as follows: "Assign a 1:1 paraeducator to Bowen for instructional purposes to focus for instructional purposes to focus on functional communication and skills."

19.     Not only had the Board agreed to provide one on one support for Bowen, the Board of Education and its agents and employees had actual knowledge that Bowen suffered from pica. For example, in a note contained in Bowen's school health records from April 20, 2016, it was noted that Bowen "needed consistent adult supervision":

> At school, Bo also has of history of frequent pica-related behaviors including sliding out of his classroom chair and dropping to the floor to find things to put in his mouth, seeking out trash bins to find food to eat, and taking food from his classmates at lunch. Records indicate that he continues to engage in some pica behaviors, though a decrease in these behaviors was noted in response to use of strategies including periodic snacks. He also continues to drops to the floor in the classroom and in hall transitioning. Bo also has eloped from the classroom to the nurse's station to access food or to a couch in front of the school building, and does not display safety awareness. **He has needed consistent adult supervision and assistance throughout his day.**

(Emphasis added).

20.     During the 2016-2017 and 2017- 2018 school year, Central Special provided 1:1 support for Bowen as promised. When it committed to doing so, it was able to adequately supervise Bowen and manage his pica disorder.

**2017-2018 School Year**

21.     During the 2017-2018 school year, Bowen's pica manifest itself at times, but – given that Bowen received adequate supervision – staff quickly addressed these incidents without any threat to Bowen's health or safety.

22.     For example, on March 16, 2018, a Central Special employee wrote that Bowen was "mouthing almost every item in the classroom as well as licking (trying) the carpet square at his desk which we have not seen before."

23.     Days later, on March 23, 2018, a Central Special employee wrote that Bowen "was mouthing a lot of items he has not mouthed all year."

24.     Several days later, a Central Special employee wrote that "we have seen less mouthing of items than week." On March 27, 2018, a Central Special employee reiterated that "[m]outhing of items are continuing to decrease again!"

25.     Again, proper supervision ensured that Bowen was safe at school. On April 24, 2018, a Central Special employee wrote that Bowen "had a few difficult moments this morning with mouthing items but once he sat down to work he got back on track."

**2018-2019 School Year**

26.     Similarly, during the 2018-2019 school, Bowen's pica did manifest itself at times, but the reasonable supervision that was being provided ensured that employees could quickly intervene to ensure that Bowen's safety was not at risk.

27.     On September 7, 2018, a Central Special employee wrote that Bowne **"**did get a hold of green chalk, he even got it in his mouth but we got it out before he managed to eat it."

28.     On September 11, 2018, a Central Special employee wrote that Bowen was "[g]rabbing a lot of things and trying to put them in his mouth along with his chewy."

29.     On September 12, 2018, a Central Special employee wrote that Bowen "[g]rabbing a lot of things and trying to put them in his mouth."

30.     On November 29, 2018, a Central Special employee wrote that Bowen was "[l]ooking for food and other things to put in his mouth (ie blocks, large puzzle pieces . . .)."

31.     On February 27, 2019, Bowen was taken to the health room to visit the nurse because he "got a hold of some white [illegible] paint and tried to eat it."

32.     On June 3, 2019, Bowen visited the health room to visit the nurse at 12:45 p.m. because he "ate chalk found on playground."

33.     While pica did manifest itself, the ability to supervise ensure Bowen's safety was manageable due to the fact that the Board complied with its agreement to provide one on one staff supervision to Bowen.

## Bowen's Individualized Education Program (IEP)
## Requires Close Adult Supervision

34.     Bowen's IEP in place at the time of his death, contemplated one on one supervision of Bowen and recognized safety concerns arising from his pica diagnosis. Specifically, following an Individualized Education Program (IEP) Team Meeting on December 6, 2018, Bowen's IEP provided, in part, as follows:

    a.  **Reading**: "Bowen requires adult support, direct instruction and prompt hierarchy." The IEP further provides that, "[d]uring reading instruction, *Bowen requires and benefits from direct 1:1 adult support* as well as a prompt hierarchy in order to access activities and instruction."

    b.  **Math**: "Bowen requires adult support, direct instruction and prompt hierarchy." The IEP further provides that, "[d]uring math instruction *Bowen requires and benefits from direct 1:1 adult support* as well as a prompt hierarchy in order to access activities and instruction."

    c.  **Adaptive Skills**: "Bowen requires adult support and prompt hierarchy." The IEP further provides that "*Bowen requires and benefits from direct 1:1 adult support* as well as a prompt hierarchy in order to access activities and instruction."

    d.  **Vocational**: "Bowen requires adult support and prompt hierarchy."

    e.  **Written Expression**: "Bowen requires adult support, direct instruction and prompt hierarchy." The IEP further provides that, "[d]uring reading instruction, *Bowen requires and benefits from direct 1:1 adult support* as well as a prompt hierarchy in order to access activities and instruction."

    f.  **Fine/Visual Motor**: "Bowen requires adult support, direct instruction and prompt hierarchy."

g. **Sensorimotor**: "Bowen requires adult support, direct instruction and prompt hierarchy."

h. **Feeding**: "Bowen requires direct adult assistance when eating."  The IEP further provides that, "Bowen requires direct adult assistance to remove food from his lunch bag, cut up his food, and pace his eating. *Bowen requires adult assistance and monitoring during lunch to encourage his use of utensils rather than fingers*. He requires monitoring to prevent him from reaching for peers' food."

**"Supplementary Aids, Services, Program Modifications and Supports"**

i. With respect to "Supplementary Aids, Services, Program Modifications and Supports," Bowen's IEP provides for "Instructional Support" that he would receive services including "Opportunities for 1:1 instruction to learn or practice new skills" on a "Daily" basis between December 6, 2018 to December 5, 2019 with the providers to include "Special Ed Teacher" and "Instructional Assistant."

j. It further provides that "Bowen will be provided with opportunities for 1:1 instruction to practice and learn new concepts. In addition, Bowen will have access to a slant board to maximize learning and present materials. This allows Bowen to view materials at eye level during 1:1 instructional opportunities. Bowen will have access to his communication device throughout the school building and in the community setting to make requests. Bowen will have access to manipulatives for academic and vocational tasks: Ensure that manipulatives are large enough so Bowen is unable to put objects in his mouth. Reading lessons will incorporate objects and pictures to help illustrate vocabulary and concepts."

**Social/Behavior Supports**

k. For "Social/Behavior Supports," the IEP provides for "Adult Support" on a daily basis, which is to be provided by the "Special Ed Teacher" and "Instructional Assistant."

l. "Bowen will have adult support to learn new concepts and skills, and for self-care and mealtime supervision. Bowen requires direct 1:1 adult support to aid in the acquisition of new skills, to access the curriculum and complete work tasks both in the classroom and around the school building. Bowen benefits from an adult gaining is attention by using sound, touch and/or bright colors prior to starting and activity or responding to a question. Bowen benefits from frequent movement within the classroom and school environment when possible. The use of manipulatives and sensory activities provide Bowen tools to focus, and increase comprehension to be successful in the school environment and in the community."

11

### Least Restrictive Environment

    m. The IEP further indicates that Bowen needs a "Bus assistant for safety" to accompany him during transport and "Transportation personnel" should be aware that "Bowen's backpack needs to kept out of reach due to the fact that he will eat his lunch and/or inedible objects."

35.    Bowen's IEP and the mediation agreement make it clear that the Board had actual notice of Bowen's educational and safety needs, and it agreed to provide him with one on one adult supervision.

### 2019-2020 School Year

36.    Central Special has numerous underpaid and deeply caring and dedicated teachers, educators and support staff who care deeply about the disabled children at the school. Unfortunately, during the fall of 2019, the school was understaffed and placed the disabled children, including Bowen, at the school in grave risk.

37.    When Bowen returned to Central Special during the fall of 2019, the school failed to provide him with 1:1 supervision as the Board of Education had agreed to provide for him.

38.    It is believed and alleged that, due to the low pay, Central Special was understaffed and unable or unwilling to hire enough qualified, responsible individuals to care for the students at Central Special. As a result, the school suffered personnel shortages that placed disabled children in serious danger, including Bowen.

39.    Prior to the fall of 2019, Bowen's pica disorder would manifest itself at times, but these incidents were quickly addressed.

40.    During the fall of 2019, however, due to inadequate supervision, the Board of Education placed Bowen in a deadly situation based on the Board's failure to ensure the children at the school, including Bowen, received reasonable supervision.

41.     Based on this insufficient supervision, it was plainly foreseeable to Central Special that Bowen could be injured based on a failure to provide reasonable supervision.

42.     On September 6, 2019, an employee at Central Special wrote she could temporarily (it appears for six school days) provide Bowen with one on coverage by rotating employees: "[S]ince job sites don't start until 9/17[,] I have the hands to give him rotating one/one work - yeah!"

43.     On September 13, 2019, an employee at Central Special wrote that she was sending car toys home because he was putting the toys in his mouth.  She wrote: "[C]ars coming home, he puts the whole car in his mouth."

44.     In mid-September 2019, apparently aware that the Board of Education had not hired sufficient employees to provide the supervision that the Board of Education had promised to provide, an employee wrote the following note and included it in a Communication Log to Plaintiffs to explain that she was "still waiting for help" for Bowen:



45.     On September 19, 2019, an employee at Central Special – *who it appears was expected to simultaneously supervise five special needs children by herself* – notified Plaintiffs that Bowen had eaten "something" off the floor, but she "couldn't get to him fast enough" to identify what was eaten or prevent it:

"Bowen picked something small off the floor and before I could get around the table to him I saw a 'chew' and gone. **I am the only one here. With 5[,] while others are at jobs and I couldn't get to him fast enough**. I think it was a goldfish cracker (Grace had some yesterday) but I couldn't be sure."

(Emphasis added).

46.     That same day, Bowen visited the nurse at 10:07 a.m. because he "picked up something off the floor and swallowed it before anyone could get to him."

47.     Upon information and belief, in lieu of paid employees who were trained to work with students with special needs, Central Special sought to compensate for this staffing deficiency by occasionally using young, untrained high school volunteers in the classroom to fill these staffing lapses.

48.     On September 20, 2019, an employee at Central Special advised Plaintiff that Bowen ate a cookie that flew out of a wrapper from another student: "[S]tudent was opening cookie it flew out of the wrapper, he grabbed it and stuffed before I got there."

49.     That same day, Bowen was taken to the health room to visit the nurse at 2:20 p.m. because he "ate some chalk."

50.     On September 26, 2019, Bowen was taken to the health room to visit the nurse because he "was outside and got a hold of milkweed and ate a pod." The school called poison control due to concerns that he consumed toxic parts of the plant.

51.     On September 27, 2019, Bowen visited the health room to see the nurse because he "ate a hair scrunchie (navy) and a (pink) hairtie."

52.     On October 2, 2019, Ms. Levy wrote a note to a school employees to "see if Bowen has eaten anything he shouldn't of because his behavior yesterday after school was very off for him." In response to Ms. Levy's inquiry, a school employee wrote the following:

   a.   "we took chalk out of his mouth";

14

b.   "we think he ate a cricket - not sure it may have jumped away";

c.   "think he swallowed a wheel of one of his trucks";

d.   "no food that we know of".

53.   On October 3, 2019, a school employee inquired whether she should write down what Bowen has eaten or placed in his mouth. "Do you want me to write down each day what he ate or was taken out of his mouth?" Ms. Levy responded: "If you could write down what he actually has eaten (that he is not supposed to) & when he uses the bathroom successfully, that would be great."

54.   On October 3 or 4, 2019, a school employee documented that Bowen had eaten sidewalk chalk: "eaten today - small end of sidewalk chalk."

55.   On October 7, 2019, a school employee wrote that Bowen "didn't ingest anything today."

56.   On October 11, 2019, a school employee wrote that Bowen "ate - pieces of twig."

57.   On October 14, 2019, a school employee wrote that Bowen "ate - paper scrap."

58.   On October 17, 2019, a school employee wrote that Bowen ate a "small amount of 'play doh'" and "some type bug," which looked like a "cricket."

59.   On October 18, 2019, a school employee wrote that Bowen ate the wheels of a truck.  The employee wrote that "he ate both (wheels)" off a truck but she "only found one in his mouth and took it out."

60.   On October 21, 2019, a school employee wrote that Bowen ate "piece of tissue", "paper 2 pieces," and "2 tissues, chalk."

61.   On October 23, 2019, a school employee wrote that Bowen ate a "small piece of crayon."

62.     On October 25, 2019, a school employee wrote that Bowen "took a strawberry yogurt biscuit from another student and ate it."

63.     On October 30, 2019, a school employee wrote that Bowen ate an "indian corn kernel."  The corn kernel was described as "one crunched into pieces." Bowen apparently also ate a "pastel crayon in Art."

64.     On October 31, 2019, a school employee wrote that Bowen found an "indian kernal and chewed on it."

65.     On November 4, 2019, the day before the fatal incident, a school employee wrote that Bowen ate a "wood piece of small clothespin."

66.     It is believed and alleged that Bowen ate additional items that were either not observed and/or not documented by employees at Central Special.

67.     As of November 4, 2019, it was plainly foreseeable that Bowen would put items into his mouth and attempt to eat them if he was not supervised by an adult, which, in fact, occurred the following day.

**Rubber Gloves at Central Special**

68.     Despite the fact that rubber gloves presented a deadly threat to children with pica, rubber gloves were readily available and unsecured throughout Central Special

69.     Boxes of rubber gloves were present in Bowen's classroom and in the restroom and were not secured and were visible and openly accessible to Bowen on the shelf, even though it was well known that he suffered from pica and was likely to attempt to swallow items such as the unsecured gloves.

70.     Despite the safety threat these gloves presented to Bowen and other young children who may put them in their mouths, there was no apparent system in place to ensure children such as Bowen could not access these gloves

### November 5, 2019

71.     On November 5, 2019, at approximately 9:18 a.m., Bowen arrived at Central Special for a regular day of school.

72.     At approximately 12:30 p.m., Bowen's teacher left the school for the day based on a scheduled day off. There was no substitute teacher available to fill in for the teacher in her absence.

73.     During the day, ***on two occasion***s, A.O., a staff member, took rubber gloves from Bowen. On one occasion, A.O. took a rubber glove from Bowen's hands. On another occasion that same day, A.O. pulled a rubber from Bowen's mouth.  These events were life-threatening events because Bowen could have attempted to swallow the gloves, which he in fact did later in the day, ultimately resulting in his death.  Yet despite this, A.O. and other staff members took no steps to secure the gloves or make them not visible or accessible to Bowen.  Instead the rubber gloves remained visible and accessible to Bowen and other student on a brown sorter on the shelf near the sink, adjacent to the entrance to the classroom, which allowed Bowen to take a glove later in the day, attempt to swallow it and suffocate. Additionally, the Board regularly allowed unsecured rubber gloves to sit openly on the bus that transported Bowen to school each day, including on November 5, 2019.

74.     At approximately 3:00 p.m., there were seven students in the classroom, including Bowen. At this time, while there was no teacher present, and a single teacher's assistant had the responsibility for supervising seven to nine students with disabilities, including Bowen, in the

classroom.   This was far less than the usual staffing of one full-time teacher and up to four para-educator, which still not staffed sufficiently to protect students and insure safety in the courtroom.

75.     In addition to supervising these seven to nine students, the substitute for the teacher's assistant also had the responsibility to supervise two high school volunteers who were also present in the classroom. Upon information and belief, one of the high school volunteers was in her first semester of her freshman year in high school. The Board could not reasonably rely upon the high school students to provide appropriate supervision for Bowen and the other students in the classroom.

76.     Upon information and belief, the substitute who fills in for teachers' assistants who was supervising these seven to nine students, which included Bowen, and the high school volunteers could not reasonably be expected to provide reasonable supervision. This was a gross degree of understaffing.  This understaffing resulted from a confluence of negligence on the part of the defendants, including the following: a.) D.W., a regular teaching assistant in the classroom, was absent that day;   b.) A.V., the regular teacher, left at 12:45 that day c.) no one checked the sub list after A.V. left that day; d.) another 1:1 was not brought in;   e.) other staffers had been sent out of the classroom including A.O. who was sent to the pool with a teaching assistant, J.C., who was sent to help A.O.; f.) the sub plans, if any, that were left for Bowen were apparently not reviewed that day by the remaining staff; there were apparently no plans left by the teacher, A.V. for the subs to follow; and g.) chronic failure to fund adequate staffing at Central Special, which was never addressed until after the death of Bowen Levy called public attention to this issue.

77.     The Board has now exacerbated these issues by considering the 1:1 supervision only for "academic" issues when the staff in the classroom clearly considered the 1:1 for all supervision associated with Bowen.  Additionally, the principal, defendant Marston, has taken the position that it was "up to the teacher's discretion" to assign the 1:1 role for Bowen, and no 1:1 was assigned in the absence of the regularly assigned teacher that afternoon.

78.     In the DSS investigation, nearly all staffers assigned to Bowen's classroom expressed concern that the classroom, and indeed the entire Central School, had been chronically understaffed.  At the time Bowen suffocated on the glove, the classroom was staffed by a single substitute, who was responsible for supervising seven disabled students, including Bowen, and two high school volunteers.  This level of supervision violates any reasonable standard of care, violates any reasonable, appropriate or safe level of staffing for Bowen and other students at Cenral Special, and was a proximate cause of Bowen's death.

79.     Upon information and belief, an employee or volunteer either left out a box of unused latex gloves, dropped a latex glove, or discarded a latex glove in Bowen's classroom.

80.     Upon information and belief, shortly before 3:15 p.m., while still in the classroom, Bowen picked up a latex glove and inserted it into this mouth.

81.     It was foreseeable that Bowen would engage in this conduct given his pica diagnosis and numerous other incidents that occurred at Central Special, including on the same day, and especially given the staffing levels in the classroom.

82.     Upon information and belief, Bowen began to choke on the plastic glove.

83.     Upon information and belief, had sufficient staff been present in the classroom and reasonable care been taken, either the latex glove would have been located in the classroom and properly discarded or staff would have prevented Bowen from inserting it into his mouth.

84.     Upon information and belief, had sufficient staff been present in the classroom providing reasonable supervision and reasonable care been taken, even if Bowen had placed the latex glove in his mouth, staff would have immediately removed the glove from his mouth.

85.     The teacher's assistant was not able to provide reasonable supervision in the classroom due to the large number of students and volunteers in the classroom.

86.     Upon information and belief, one of the high school volunteers was distracted and checking her cell phone rather than observing the students, including Bowen.

87.     Upon information and belief, Bowen began to choke on the latex glove.

88.     Upon information and belief, no one noticed when Bowen first began to choke on the latex glove.

89.     The teacher's assistant noticed Bowen choking and led him to the health room to see the nurse.

90.     An employee called 911. He was described by the caller as "turning blue" and "kind of limp" and "we are not sure what is going on." The employee further indicated he was not breathing.

91.     EMS arrived to Central Special. He was given CPR and an automated external defibrillator was also used as well.

92.     EMS removed the latex glove from Bowen's mouth.

93.     Upon information and belief, Bowen was deprived of oxygen for 10 minutes.

94.     EMS intubated Bowen was transported to Anne Arundel Medical Center.  Bowen was later moved to Johns Hopkins Hospital in Baltimore, Maryland.

95.     Bowen died on November 10, 2019. His death was caused by choking as a result of aspiration on a vinyl glove with pica listed as a contributing condition, and resulted from the negligence and breach of contract of the defendants, as set forth herein.

**COUNT I**
**Negligence**
**(Failure to Supervise Classroom)**
**(Plaintiffs v. All Defendants)**

96.     Plaintiffs sue Defendants for cause, claim, damages, and hereby adopt and incorporate by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

97.     Defendants Board of Education and Marston owed a duty of care to supervise the children and students at Central Special with reasonable care, including Bowen, and ensure that the children were safe while at school.

98.     Defendant Board of Education and Marston also owed a duty of care to ensure that sufficient staff were in the classroom to supervise the children in each classroom, including Bowen's classroom.

99.     Defendant Board of Education and Marston stood in an *in loco parentis* relationship with its students and have a special duty to protect students, including Bowen, from harm. Defendant Board of Education owed Plaintiffs a duty of reasonable care to ensure that its employees would perform proper supervision and protect its students from harm, including Bowen. The standard of care, which Defendant breached, required that the Board of Education take into account Bowen's age, education, disabilities, experience, and known risks to Bowen's safety.

100.    Defendants Board of Education and Marston negligently breached this duty when it failed to inspect the floor to ensure there were no latex gloves accessible to students with pica,

21

including Bowen.

101.    Defendants Board of Education and Marston negligently breached this duty when it failed to secure any latex gloves so any gloves were inaccessible to students.

102.    Defendants Board of Education and Marston negligently breached this duty when, knowing that Bowen suffered from pica, it failed supervise Bowen to observe his conduct when he put a latex glove in his mouth so that he did so undetected and unobserved.

103.    Defendants Board of Education and Marston and their agents knew or should have known of prior incidents when Bowen put things in his mouth and the contents of his IEP, and as a result, it was reasonably foreseeable that this incident would occur absent proper supervision.

104.    As a direct and proximate result of the Defendants' actions, Bryan Levy as Personal Representative of the Estate of Bowen Levy suffered economic damages, including medical expenses and funeral expenses and non-economic damages, including conscious pain and suffering resulting from Bowen swallowing a rubber glove, suffocating on it, experiencing a loss of oxygen for 10 minutes, which resulted in his death five days later.

105.    As a direct and proximate result of the Defendants' actions, Bryan and Tanya Levy, individually and as parents and next friend of Bowen Levy, sustained pecuniary loss, medical expenses, funeral expenses, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of attention, loss of advice, loss of counsel, loss of training, loss of guidance and loss of education.

WHEREFORE, Plaintiffs request that the Court enter a judgment against Defendants Board of Education and Marston as follows: (a) Awarding Plaintiffs monetary damages against Defendants, individually, jointly and severally, in an amount to be determined at trial, but,

pursuant to Md. Rule 2-305, the amount sought exceeds $75,000; (b) Awarding Plaintiffs their

costs and expenses in this litigation; and (c.) Awarding Plaintiffs such other relief as the Court

deems just and proper.

## COUNT II
### Breach of Contract
### (Plaintiff Bryan and Tanya Levy v. Defendant Board of Education)

106.     All allegations contained in all of the paragraphs of this Complaint are

incorporated by reference as though set forth fully herein.

107.     Plaintiffs Bryan and Tanya Levy entered into a contract with Defendant Board of

Education whereby the Board of Education agreed to the following:

1. AACPS will assign a 1:1 for Bowen for instructional purposes focusing on
function skills (including, but not limited to self-help and communication skills).
2. The AACPS program specialist certified as a BCBA will provide
consultation/observation/modeling for the 1:1.
3. Speech/language services will be increased to 3-30 minute sessions weekly.
4. Occupational therapy will be increased to 30 minutes/weekly.
5. AACPS will provide the recommended communication device for use in the
home.
6. AACPS will consult with the familys' in home provider to ensure consistency
in programming.
7. AACPS will convene a 60 day review to review progress.
8. AACPS will compensate the costs of the private evaluator attending the IEP
team meeting on receipt of invoices ($937.50)
9. AACPS will pay the parent's attorney a sum of $1,000.00 on receipt of
invoices.
10. This agreement resolves all concerns through this date of this agreement.
11. The parents will and hereby do agree to withdraw their request for a due
process hearing with prejudice.

(Emphasis added).

108.     The Board of Education breached this agreement when it failed to provide Bowen

with 1:1 supervision on November 5, 2019 during instructional time.  Contrary to the Board's

assertions, the principal and staff recognized and communicated to Bowen's parents and

obligation to provide 1:1 supervision and but negligently failed to do so on November 5, 2019, resulting in his death.

109.    Plaintiffs Bryan and Tanya Levy, individually and as parents and next friend of Bowen Levy, suffered damages as a result of the Defendant's breach of this agreement, including pecuniary loss, medical expenses, funeral expenses, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of attention, loss of advice, loss of counsel, loss of training, loss of guidance and loss of education

WHEREFORE, Plaintiffs Bryan and Tanya Levy request that the Court enter a judgment against Defendant as follows: (a) Awarding Plaintiffs monetary damages against Defendant in an amount to be determined at trial, but, pursuant to Md. Rule 2-305, the amount sought exceeds $75,000; (b) Awarding Plaintiffs their costs and expenses in this litigation; and (c) Awarding Plaintiffs such other relief as the Court deems just and proper.

## COUNT III
### (Survival Action)
### (Plaintiff Bryan Levy as Personal Representative of the
### Estate of Bowen Levy, deceased v. All Defendants)

110.    All allegations contained in all of the paragraphs of this Complaint are incorporated by reference as though set forth fully herein.

111.    This Count is brought on behalf of the Estate of Bowen Levy for damages that Bowen Levy, or his parents and next friend could have claimed for him for damages during his lifetime, including the medical bills incurred, funeral expenses, the catastrophic injury to Bowen, the conscious pain and suffering, and serious and profound injuries which he suffered.

112.    As a result of defendants' negligence as set forth herein, and the Board's breach of its agreement to provide him competent 1:1 supervision, Bowen swallowed a rubber glove,

suffocated on the glove, lost oxygen for ten minutes, experienced conscious pain and suffering, suffering serious medical injuries, from which he died five days later.

113.    Plaintiff Bryan Levy is the Personal Representative of the Estate of Bowen Levy, and accordingly is entitled and charged by law to represent the Estate of Bowen Levy and to sue on behalf of the Estate for any sums which may be due to it for either liquidated or unliquidated damages.

114.    As a direct and proximate result of the negligence of Defendants, and the injuries and damages sustained by the decedent, Plaintiff Levy, as Personal Representative of the Estate of Bowen Levy, has suffered damages, including medical expenses and funeral bills.

115.    It is further alleged that as a direct and proximate result of the negligence of the Defendants, the decedent sustained conscious pain and suffering between the time of the collision and the time of his death.

116.    It is alleged that all damages, injuries and losses were caused by the negligent acts of Defendants, as set forth above, without any negligence or want of due care on the part of the decedent and/or on the part of the Plaintiffs.

WHEREFORE, Plaintiff Bryan Levy, as Personal Representative of the Estate of Bowen Levy, deceased, demands judgment against Defendant Board of Education and Marston in an amount to be determined at trial, but, pursuant to Md. Rule 2-305, the amount sought exceeds $75,000 plus interest and costs, as well as further and additional relief as the nature of the case may require and which this Honorable Court shall deem just and proper.

**COUNT IV**
**(Wrongful Death)**
**(Plaintiff Bryan Levy and Tanya Levy as surviving**
**parents of Bowen Levy v. All Defendants)**

117.     All allegations contained in all of the paragraphs of this Complaint are incorporated by reference as though set forth fully herein.

118.     This cause of action is brought on behalf of Bryan Levy and Tanya Levy, the surviving parents of Bowen Levy, deceased. Bryan Levy and Tanya Levy are residents of Anne Arundel County, Maryland. Both Bryan Levy and Tanya Levy are primary beneficiaries in this action under Md. Code, § 3-904(a) of the Courts & Judicial Proceedings Article.

119.     At all times relevant hereto, it was the duty of Defendants Board of Education and Marston to supervise the classroom when students are present and to do so in a careful and prudent manner for the conditions then existing. Such duty required the Board and its agents to dedicate their full time and attention to the supervision and education of the children in its care and custody.

120.     Defendants Board of Education and Marston breached the duties owed to Plaintiff when it negligently failed to supervise the classroom and Bowen in a careful and prudent manner for the conditions then existing; negligently failed to dedicate it full time and attention to supervising the disabled children in its custody, including Bowen, and it negligently failed to comply with reasonable supervision obligations and the decedent's IEP.

121.     As a direct and proximate result of Defendants' negligent conduct, and as a direct and proximate result of defendants' breach of its agreement to provide competent 1:1 supervision, Plaintiffs incurred damages which include, but are not limited to, sustained pecuniary loss, mental anguish, emotional pain and suffering, loss of society, loss of companionship, loss of comfort, loss of protection, loss of filial care, loss of attention, loss of advice, loss of counsel, loss of training, loss of guidance and loss of education.

122.     All such damages, injuries, and/or losses – past, present, and prospective – were

caused by the negligent acts of Defendants.

123.     Bowen Levy was in no way contributorily negligent, nor did he assume the risk of

his injuries.

WHEREFORE, Plaintiff Bryan Levy and Tanya Levy, the surviving parents of Bowen

Levy, demand judgment against Defendants Board of Education and Marston in an amount to be

determined at trial, but, pursuant to Md. Rule 2-305, the amount sought exceeds $75,000 in

compensatory damages, to be proportioned pursuant to C.J.P. § 3-904(c), plus interest and costs.


## JURY DEMAND

Plaintiffs demand a jury trial as to all claims so triable.


_____/s/_____
Timothy F. Maloney



Respectfully submitted,

By:     _____/s/_____
Timothy F. Maloney, CPF No. 8606010245
tmaloney@jgllaw.com
Matthew M. Bryant, CPF No. 0712110104
mbryant@jgllaw.com
Alyse L. Prawde, CPF No. 1412180033
aprawde@jgllaw.com
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
Phone: (301) 220-2200
Fax: (301) 220-1214

David Simpson, Esq., CPF No. 7806010146
dsimpson@davidsimpsonpa.com
DAVID M. SIMPSON, P.A.
6404 Ivy Lane, Suite 408
Greenbelt, MD 20770
(301) 474-9634

*Counsel for Plaintiffs*